**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| Matthew Keyser, | ) | Case No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT FOR DAMAGES** |
| v. | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| Northern Wind, LLC, Walmart Inc., and Stanley | ) | |
| Pearlman Enterprises, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW the Plaintiff, Matthew Keyser, by and through his attorneys of record, the

law firms of Nicolet Law Office S.C. and Marler Clark, Inc., PS, complaining of the Defendants,

Northern Wind, LLC, Walmart Inc., and Stanley Pearlman Enterprises, Inc., and by this Complaint

alleges and states as follows:

**PARTIES**

1.      At all times relevant to this action, the Plaintiff resided in Rock County, Wisconsin.

The Plaintiff is therefore a citizen of the State of Wisconsin.

2.      At all times relevant to this action, Defendant Northern Wind, LLC (hereinafter

"Northern Wind") was a limited liability company formed under the laws of the State of Delaware,

with its principal place of business located at 16 Hassey Street, New Bedford, Massachusetts 02740.

Upon information and belief, at least one owner or manager of Northern Wind is US Sustainable

Catch Buyer, Inc., a corporation organized and existing under the laws of the State of Delaware, with

its principal place of business in Washington, DC. As such, Northern Wind is a citizen of Delaware,

Massachusetts, and the District of Columbia. Upon information and belief, Northern Wind is a direct

off-loader, processor, and distributor of fresh and frozen scallops, and it processed and/or distributed

1

the contaminated frozen scallops that are the subject of this lawsuit. Northern Wind does, and did at all times relevant to this complaint, conduct business throughout the United States, including in Wisconsin, where the contaminated frozen scallops were sold and distributed.

3.    At all times relevant to this action, Defendant Stanley Pearlman Enterprises, Inc. (hereinafter "Stanley Pearlman") was a for-profit corporation formed under the laws of the State of Maryland, with its principal place of business located at 7775 Chesapeake Bay Court, Jessup, Maryland 20794. As such, Stanley Pearlman is a citizen of the State of Maryland. Upon information and belief, Stanley Pearlman supplied the subject frozen scallops to Defendant Walmart, Inc., which subsequently sold them to Plaintiff in Wisconsin, where the product was marketed and distributed.

4.    At all times relevant to this action, Defendant Walmart Inc. (hereinafter "Sam's Club") was a for-profit corporation formed under the laws of the State of Delaware, with its principal place of business located at 702 SW 8th Street, Bentonville, Arkansas 72716. As such, Sam's Club is a citizen of Delaware and Arkansas. Upon information and belief, Sam's Club, where Plaintiff purchased the subject scallops, is owned by Walmart Inc. and operates as a membership-only warehouse club and division of Walmart Inc. Sam's Club conducts business throughout the United States, including the State of Wisconsin, where Plaintiff purchased the contaminated scallops at the Sam's Club located at 3900 Deerfield Dr, Janesville, Wisconsin 53546.

### JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, and it is between citizens of different states. This Court also has personal jurisdiction over the defendants, as they conduct business in Wisconsin, maintain sufficient minimum contacts with the State through continuous and systematic activities, and have purposely availed themselves of the protections and benefits of Wisconsin law, such that maintenance of the suit in this district does not offend traditional

notions of fair play and substantial justice.

6.      Venue in the Western District of Wisconsin is proper pursuant to 28 USC § 1391(a)(1) and (2) because the defendants are subject to personal jurisdiction in this judicial district.

## FACTS

### The Bacteria *Vibrionaceae*

7.      The bacteria *Vibrionaceae*, which encompasses several potential pathogens, including *V. cholera*, the causative agent of cholera, and *V. vulnificus*, the deadliest seafood-borne pathogen, are a well-studied family of marine bacteria that thrive in diverse habitats.[1] The bacteria in the *Vibrio* genus are gram-negative, curved-rod-shaped mobile bacteria that inhabit marine and estuarine environments throughout the world. They are natural inhabitants of those aquatic ecosystems.[2]

8.      As a member of the *Vibrionaceace* family and *Vibrio* genus, *Vibrio* was first identified in 1951 by Tsunesaburi Fujino from Research Institute of Microbial Diseases (RIMD), Osaka University from an acute gastroenteritis outbreak. The outbreak occurred in a southern suburb of Osaka, Japan due to consumption of "shirasu," a type of dried sardine which resulted in 20 deaths and 272 infected patients at that time.[3]

9.      Non-cholera *Vibrio* (NCV) species are important causes of disease. These pathogens are thermophilic and climate change could increase the risk of NCV infection.[4] According to the

---

[1]      Takemori, A. F., Chien, D. M., & Polz, M. F. (2014). Associations and dynamics of *Vibrionaceae* in the environment, from the genus to the population level. *Frontiers in microbiology*, *5*, 38. https://www.frontiersin.org/articles/10.3389/fmicb.2014.00038/full

[2]      Vezzulli, L., Baker-Austin, C., Kirschner, A., Pruzzo, C., & Martinez-Urtaza, J. (2020). Global emergence of environmental non-O1/O139 Vibrio cholerae infections linked with climate change: a neglected research field?. *Environmental microbiology*, *22*(10), 4342-4355. https://ami-journals.onlinelibrary.wiley.com/doi/abs/10.1111/1462-2920.15040

[3]      Wang, R., Zhong, Y., Gu, X., Yuan, J., Saeed, A. F., & Wang, S. (2015). The pathogenesis, detection, and prevention of Vibrio parahaemolyticus. *Frontiers in microbiology*, *6*, 144. https://www.frontiersin.org/articles/10.3389/fmicb.2015.00144/full

[4]      Logar-Henderson, C., Ling, R., Tuite, A. R., & Fisman, D. N. (2019). Effects of large-scale oceanic phenomena on non-cholera vibriosis incidence in the United States: implications for climate change. *Epidemiology & Infection*, *147*. https://www.cambridge.org/core/journals/epidemiology-and-infection/article/effects-of-largescale-oceanic-phenomena-on-noncholera-vibriosis-incidence-in-the-united-states-implications-for-climate-change/635497F10E8E94060A291E0C23F7AF0F

Centers for Disease Control, vibriosis causes an estimated 80,000 illnesses and 100 deaths in the United States every year.

10.     People with vibriosis become infected by consuming raw or undercooked seafood or exposing a wound to seawater. Most infections occur from May through October when water temperatures are warmer.[5]

11.     Climate change is a global phenomenon which is affecting marine and terrestrial environments worldwide. Changing climatic conditions under such dramatic scenario are becoming increasingly suitable for the transmission of several infectious diseases caused by microbial pathogens, by directly affecting their biological features (e.g., growth, survival, and virulence), reservoirs and vectors, or by favoring their transmission through induced changes in ecosystems and human behavior.

12.     In aquatic environments bacteria belonging to the *Vibrio* genus tend to be more common in warmer waters, especially above 17ºC, and are particularly sensitive to changing environmental conditions. This bacterial genus contains more than 100 confirmed species, 12 of which have been demonstrated to cause infections in humans.[6]

13.     Although the incidence of vibriosis varies by state (highest, Hawaii, 1.7; lowest, Oklahoma, 0.03) the 3 most common species involved in human illness in the United States are *Vibrio parahaemolyticus*, *Vibrio vulnificus*, and *Vibrio alginolyticus*, although some state-to-state variation exists as *Vibrio vulnificus* is the most common species reported in Florida. Most of these vibrio infections involve cases of gastroenteritis or skin and soft tissue infections resulting from traumatized mucosal surfaces.[7]

14.     *Vibrio cholerae* is the causative agent of cholera and by far the most relevant *Vibrio*

---

[5]     Centers for Disease Control and Prevention. (2019, March 5). *Vibrio species causing vibriosis*. Centers for Disease Control and Prevention. https://www.cdc.gov/vibrio/index.html

[6]     Vezzulli, L. (2022). Global expansion of Vibrio spp. in hot water. *Environmental Microbiology Reports*, *15*(2), 77-79.

[7]     Janda, J. M., Newton, A. E., & Bopp, C. A. (2015). Vibriosis. *Clinics in laboratory medicine*, *35*(2), 273-288. https://www.labmed.theclinics.com/article/S0272-2712(15)00026-8/fulltext

species of public health concern accounting for about three million cases of human infections each year, with a case fatality rate of about 2.4%.[8]

15.    *V. vulnificus* and *V. parahaemolyticus* are responsible for most cases of *Vibrio* gastroenteritis, but they can also cause horrifying infections of the skin and extremities when broken skin or mucous membranes are invaded by these bacteria. These microorganisms can cause illness via ingestion of untreated water or contaminated fish or shellfish and are routinely isolated from warm coastal waters around the world, including the United States.

16.    Ingestion of *Vibrio* spp. with food protects the organism from the bactericidal effect of stomach acid, so the infectious dose (ID) in contaminated water is considerably higher than when consumed with food. [9]

17.    Although the overall incidence of vibriosis is low, the definitive diagnosis of such illnesses is critical because several species-associated disease syndromes, including cholera (toxigenic *V. cholerae* O1) and necrotizing fasciitis (*V. vulnificus*) are life-threatening events. Current data suggest that various conditions associated with vibriosis are either misdiagnosed or not considered as part of the diagnosis during initial presentation with accompanying symptoms.[10]

18.    *V. parahaemolyticus* is the most common cause of foodborne vibriosis in the United States and is a leading cause of food-associated gastroenteritis in many countries, including Japan and Taiwan where culinary habits often involve the consumption of raw seafood or fish as part of the daily diet. The most common vehicles of infection include oysters, clams, and mussels, or local dishes in certain regions of the world such as ceviche in Peru.[11]

19.    *V. parahaemolyticus* usually presents as a secretory diarrhea accompanied by abdominal

---

[8]    Janda et al. (2015).
[9]    Froelich, B. A., & Daines, D. A. (2020). In hot water: effects of climate change on *Vibrio*–human interactions. *Environmental microbiology*, *22*(10), 4101-4111. https://ami-journals.onlinelibrary.wiley.com/doi/full/10.1111/1462-2920.14967
[10]    Janda et al. (2015).
[11]    Janda et al. (2015).

pain, vomiting, low-grade fever, headache, and chills. Blood in the stool is almost always absent, but the high percental of vomiting is usual among gram negative bacteria causing diarrhea.[12]

20.    While most individuals with vibriosis develop symptoms such as diarrhea and abdominal pain, some (particularly those with liver disease or immune compromise) may experience skin and soft tissue infection (typically characterized by bullous skin lesions) and septic shock. Infection can be transmitted by food or by exposure to contaminated salt-water, and the most severely affected individuals often have immune compromise or liver disease. Infections display summertime seasonality, which is believed to reflect the thermophilic nature of these bacteria, as well as increased leisure-related salt-water exposure and harvesting of seafood in the summer.[13]

21.    A clinician may suspect vibriosis if a patient has watery diarrhea and has recently eaten raw or undercooked seafood, especially oysters, or when a wound infection occurs after exposure to seawater. Infection is diagnosed when *Vibrio* bacteria are found in the stool, wound, or blood of a patient who has symptoms of vibriosis.[14]

22.    Polymerase chain reaction (PCR) assays are being increasingly used to identify and distinguish specific pathogenic bacteria. Multiplex PCR protocols targeting the *toxR, tlh, tdh, trh*, and *fla* genes have been developed to detect the total and pathogenic *V. parahaemolyticus* from clinical and environmental samples.[15]

23.    Early treatment of *Vibrio* poisoning is vital and commonly includes antibiotics and oral rehydration.[16] Volume repletion is the most important element of therapy in patients with *Vibrio* gastroenteritis. The gastroenteritis caused by *V. parahaemolyticus* tends to be mild and self-limited. Antimicrobial therapy is reasonable in more severe cases, since among patients with cholera,

---

[12]    Janda et al. (2015).
[13]    Logar-Henderson et al. (2019).
[14]    Centers for Disease Control and Prevention. (2019a, March 5). *Diagnosis and treatment*. Centers for Disease Control and Prevention. https://www.cdc.gov/vibrio/diagnosis.html
[15]    Wang et al. (2015)
[16]    Wang et al. (2015).

antibiotic therapy is known to decrease the duration of diarrhea and the excretion of infectious organisms.

**The Plaintiff's *Vibrio* Infection**

24.     Plaintiff purchased frozen scallops from the Janesville Sam's Club, located at 3900 Deerfield Dr, Janesville, Wisconsin 53546, on January 22, 2022. The scallops were stored in the freezer, and Plaintiff consumed some of them on February 14, 2022.

25.     On or about February 17, 2022, Plaintiff began suffering symptoms consistent with a *Vibrio* infection, including nausea, stomach cramps, and vomiting.

26.     The severity of Plaintiff's illness escalated over the next few days, with symptoms including fever and explosive diarrhea. As a result, Plaintiff was taken to the Emergency Department at Stoughton Hospital on February 19, 2022.

27.     Plaintiff's condition upon admission to the Stoughton Hospital was critical enough that, despite treatment of IV medication and fluids, he was transferred by ambulance to the Intensive Care Unit and University of Wisconsin Health – University Hospital.

28.     Plaintiff remained at University Hospital for 10 days, where he received critical life-saving care for the injuries caused by his *Vibrio* infection, including treatment for acute tubular necrosis, "Type 2 demand myocardial infarction in the setting of severe sepsis", and a direct current cardioversion to address atrial fibrillation caused by the infection.

29.     Plaintiff eventually stabilized and was discharged to home health care on March 1, 2022.

30.     A stool specimen collected upon Plaintiff's admission to University Hospital tested positive by PCR for *Vibrio parahaemolyticus* and *Vibrio vulnificus* at University Health Clinical Laboratory.

31.     The State Laboratory of Hygiene conducted further testing but did not isolate *Vibrio* in the specimen, a result not unexpected given treatment with antibiotics prior to stool collection.

7

Public health investigators interviewed Matthew and classified his infection as a probable case of vibriosis.

32. On April 18, 2022, the remaining scallops were collected from Plaintiff's home and tested at the U.S. Food and Drug Administration's (FDA) Gulf Coast Seafood Laboratory. Laboratory testing was conducted between August 9 and 30, 2022.

33. Pre-enrichment DNA extracts detected both *Vibrio vulnificus* and *Vibrio parahaemolyticus*. In post-enrichment DNA extracts, *Vibrio vulnificus* was detected. No isolates were identified as *Vibrio parahaemolyticus* or *Vibrio vulnificus* by real-time PCR or whole-genome sequencing (WGS). One isolate was identified as *Vibrio alginolyticus* by WGS.

## COUNT I
### (Strict Products Liability)

34. The Plaintiff incorporates the preceding paragraphs of this Complaint, by this reference, as if each of these paragraphs were set forth here in their entirety.

35. At all times relevant hereto, Defendants were the manufacturers, suppliers, packagers, distributors, and/or sellers of the adulterated and/or harmful food product that is the subject of this action, namely the *Vibrio*-infected frozen scallops purchased and consumed by Plaintiff.

36. The adulterated and/or harmful product that the Defendants manufactured, supplied, packaged, distributed, and/or sold was, at the time it left the Defendants' control, defective and unreasonably dangerous for its ordinary and expected use by the intended public, including Plaintiff, because the Defendants' product was adulterated and/or harmful to human health by virtue of containing *Vibrio* bacteria, a potentially deadly pathogen.

37. The adulterated and/or harmful product that Defendants manufactured, supplied, packaged, distributed, and/or sold was delivered to Plaintiff without any change in its defective condition. The adulterated and/or harmful food product that the Defendants manufactured and distributed was consumed by Plaintiff in a manner to be expected.

38. The Defendants owed a duty of care to the public, including Plaintiff, to manufacture, supply, package, distribute, and/or sell food that was not adulterated and/or harmful and that was free of substances injurious to human health. The Defendants breached this duty.

39. The Defendants owed a duty of care to the public, including Plaintiff, to manufacture, supply, package, distribute, and/or sell food that was fit for human consumption and that was safe to consume to the extent contemplated by a reasonable consumer. The Defendants breached this duty.

40. As a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated and/or harmful food product that the Defendants manufactured, supplied, packaged, distributed, and/or sold, as set forth above, Plaintiff suffered significant physical injury and pain, and faces permanent injury, future pain, and loss of enjoyment of life, all of which amount to economic injury in an amount to be proved at trial. Plaintiff also incurred medical bills and lost wages from work, amounting to economic damages in an amount to be proved at trial.

41. The Defendants are strictly liable to the Plaintiff for the harm proximately caused by the distribution and sale of an unsafe and defective food product.

## <u>COUNT II</u>
### (Negligence and Negligence *Per Se*)

42. The Plaintiff incorporates the preceding paragraphs of this Complaint, by this reference, as if each of these paragraphs were set forth here in its entirety.

43. The Defendants owed to Plaintiff a duty to use reasonable care in the manufacture, supply, packaging, distribution, and/or sale of their food product, the observance of which duty would have prevented or eliminated the risk that the Defendants' food product would become adulterated with any dangerous objects or substances like *Vibrio* bacteria. The Defendants, however, breached this duty and were therefore negligent.

44. The Defendants had a duty to comply with all federal, state, and local statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, storage, and sale

9

of their food product, but failed to do so and were therefore negligent.

45.    Plaintiff was among the class of persons designed to be protected by these statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, packaging, distribution, and sale of similar food products. The Defendants, however, breached this duty and were therefore negligent.

46.    The Defendants had a duty to properly supervise, train, and monitor their employees and to ensure that their employees complied with all applicable statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, packaging, and sale of similar food products. The Defendants, however, breached this duty and were therefore negligent.

47.    The Defendants had a duty to use supplies, tools, and other constituent materials that were reasonably safe, wholesome, and free of defects and that otherwise complied with applicable federal, state, and local laws, ordinances, regulations, codes, and provisions, and that were free from adulteration and injurious objects, and safe for human consumption. The Defendants, however, breached this duty and were therefore negligent.

48.    The Defendants had a duty to comply with all statutory and regulatory provisions that pertained or applied to the manufacture, distribution, storage, labeling, and sale of the food products that injured Plaintiff, including the applicable provisions of the Federal Food, Drug and Cosmetic Act, and similar Wisconsin public health laws, all of which prohibit the sale of any food that is adulterated or otherwise injurious to health.

49.    In breach of this duty, the Defendants failed to comply with the provisions of the health and safety acts identified above and, as a result, were negligent *per se* in their manufacture, distribution, packaging, and/or sale of adulterated food.

50.    As a direct and proximate result of the conduct by the Defendants that was negligent or negligent *per se*, as described above, Plaintiff suffered significant physical injury and pain, and faces

permanent injury, future pain, and loss of enjoyment of life, all of which amount to economic injury in an amount to be proved at trial. Plaintiff also incurred medical bills and lost wages from work, amounting to economic damages in an amount to be proved at trial.

## COUNT III
### (Breach of Express and Implied Warranties)

51.    The Plaintiff incorporates the preceding paragraphs of this Complaint, by this reference, as if each of these paragraphs were set forth here in its entirety.

52.     The Defendants are liable to Plaintiff for breaching express and implied warranties that they made regarding the injurious products that Defendants sold, and Plaintiff consumed.  These express and implied warranties include the implied warranties of merchantability and/or fitness for a particular use.

53.    Specifically, Defendants expressly warranted, through their sale of food products to be consumed by the public and by the statements and conduct of their employees and agents, that the food products they sold were fit for human consumption and not otherwise adulterated or injurious to health.

54.    The harmful and injurious food product that the Defendants sold, and Plaintiff consumed, would not pass without exception in the trade and was therefore in breach of the implied warranty of merchantability.

55.    The harmful and injurious food product that the Defendants sold, and Plaintiff consumed, would not pass without exception in the trade and was therefore in breach of the implied warranty of merchantability.

56.    The harmful and injurious food product that the Defendants sold, and Plaintiff consumed, was not fit for the uses and purposes intended, i.e., human consumption; this product was therefore in breach of the implied warranty of fitness for its intended use.

57.    As a direct and proximate cause of the Defendants' breach of warranties, as set forth

above, Plaintiff suffered significant physical injury and pain, and faces permanent injury, future pain, and loss of enjoyment of life, all of which amount to economic injury in an amount to be proved at trial. Plaintiff also incurred medical bills and lost wages from work, amounting to economic damages in an amount to be proved at trial.

## DAMAGES

58.    For purposes of pleading damages, the Plaintiff incorporates all of the above-stated allegations as if fully set forth here.

59.    Plaintiff suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of the Defendants, in an amount that shall be fully proven at the time of trial. These damages include but are not limited to past and future pain and suffering, past and future damages for loss of enjoyment of life, past and future emotional distress, past and future medical and related expenses, including pharmaceutical expenses, travel, and travel-related expenses, and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## JURY DEMAND

The Plaintiff hereby demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for judgment against the Defendants as follows:

A.    Ordering compensation for all general, special, incidental, and consequential damages suffered by the Plaintiff as a result of the Defendants' conduct;

B.    Awarding Plaintiff his reasonable attorney's fees and costs, to the fullest extent allowed

12

by law; and

C.    Granting all such additional or further relief as this Court deems just and equitable under the circumstances.

Respectfully submitted,

Dated: January 24, 2025

By: _____
Lindsay C. Lien Amin (#1103163)
NICOLET LAW OFFICE, S.C.
517 Second Street, Suite 205
Hudson, WI 54016
Telephone: 855-NICOLET
Email: lindsay@nicoletlaw.com

and

William D. Marler
MARLER CLARK, INC., PS
180 Olympic Drive S.E.
Bainbridge Island, WA  98110
Telephone: (206) 346-1888
Facsimile: (206) 346-1898
E-mail:  bmarler@marlerclark.com
(Pending admission *pro hac vice*)

Attorneys for Plaintiff

13